**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| ROBERT WILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-00429-TWP-DKL |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Robert Willis ("Willis") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and Supplemental Security Income ("SSI") under Title XVI of the Act.[1] For the following reasons, the Court **AFFIRMS** the decision of the Commissioner.

## I.   BACKGROUND

**A.   Procedural History**

On July 11, 2012, Willis filed applications for DIB and SSI, alleging a disability onset date of June 26, 2012, due to difficulty breathing, diabetes, heart and blood pressure related problems, sleep apnea, and restricted range of motion in his right shoulder. His claims were initially denied on November 21, 2012, and again on reconsideration on January 23, 2013. Willis filed a written request for a hearing on January 24, 2013 and a hearing was held on July 25, 2013 via video

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

conference, before Administrative Law Judge Angela Miranda (the "ALJ").   An impartial vocational expert, appeared and testified at the hearing and Willis was represented by counsel.   On September 23, 2013, the ALJ denied Willis's applications for DIB and SSI.   Willis requested review by the Appeals Council and on January 16, 2015, the Appeals Council denied Willis's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.   On March 16, 2015, Willis filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.      Factual Background**

At the time of his alleged disability onset date, Willis was 44 years old, and he was 45 years old at the time of the ALJ's decision.   He is now 48 years old.   Willis completed his high school education and one full year of college.   Prior to the onset of his alleged disability, Willis had an employment history of skilled and unskilled jobs that required a diverse range of exertion from medium to heavy.   He worked as an over-the-road semi-truck driver, electronics inspector, industrial cleaner, plumber, custodian, and machine molder. In June 2012, Willis left his last employment where he worked on an assembly line, due to its physical nature, his heart condition, and pain in his chest and shoulder, which caused him to experience shortness of breath, dizziness, and fatigue.

On June 3, 2009, Willis received a stress echocardiogram test that revealed severe left ventricular dilatation with mild to moderate left ventricular hypertrophy, severe global left ventricular systolic dysfunction with left ventricular ejection fraction of 15–20% at rest, and resting hypertension with an exaggerated blood pressure response to exercising.   He also had a

nuclear stress test completed, which indicated a left ventricular ejection fraction of 25–30%[2] (Filing No. 11-7 at 49–52).  Willis was diagnosed with dilated cardiomyopathy with severe left ventricular systolic dysfunction, hypertension, dyslipidemia, and signs and symptoms suggestive of sleep apnea by Kiran R. Kareti, M.D. ("Dr. Kareti"), on June 5, 2009 (Filing No. 11-7 at 54).

Willis saw William A. Heisel, M.D. ("Dr. Heisel"), on June 20, 2012, due to shortness of breath when lying flat.  Willis reported that otherwise he felt pretty good during the day and at work (Filing No. 11-10 at 52).  During this visit, Willis told his doctor that he had stopped taking his medication because he could no longer afford it.  Willis was 5'10.25" tall, weighed 237 pounds, and his blood pressure was 176/117.  *Id.*  Dr. Heisel diagnosed Willis with hypertension and cardiomyopathy.  On June 22, 2012, Dr. Heisel noted that he would keep an eye on Willis's kidney function and that better blood pressure control may be necessary to prevent Willis from developing kidney failure and needing dialysis (Filing No. 11-7 at 31). Dr. Heisel also noted that Willis's blood sugar was borderline and that weight loss may be necessary to prevent or delay the onset of diabetes.  *Id.*

On June 26, 2012, the alleged disability onset date, Willis again was suffering from shortness of breath and went to North Knoxville Medical Center.  He reported severe shortness of breath that had been worsening over the previous few days accompanied by a stomach pain, and he also mentioned that he had ankle swelling the previous few months.  During the examination, it was noted that Willis was somewhat obese and in respiratory distress.  Willis's blood pressure

---

[2] Ejection fraction is a measurement of how much blood the left ventricle pumps out with each contraction.  An ejection fraction of 50% means that 50% of the total amount of blood in the left ventricle is pushed out with each heartbeat.  An ejection fraction under 40% may be evidence of heart failure or cardiomyopathy.  *See* http://www.heart.org/HEARTORG/Conditions/HeartFailure/SymptomsDiagnosisofHeartFailure/Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp#.VtcG5_32aig.

was 206/144, and he had 1+ lower extremity edema (Filing No. 11-7 at 14).  Auscultation revealed bilateral crackles and his breathing was labored.  *Id.*  Laboratory data showed that his glucose was 189, his D-dimer was elevated at 1.39, and a V/Q scan revealed an intermediate probability for pulmonary embolus.  *Id.* A chest x-ray revealed severe bilateral pulmonary edema versus extensive pulmonary infiltrates.  *Id.*

During the June 26, 2012 examination, an EKG revealed that Willis had sinus tachycardia with a left bundle branch block and probable left ventricular hypertrophy.  Charles C. Wilder, M.D., diagnosed Willis with malignant hypertension and acute congestive heart failure, acute renal failure versus chronic kidney disease, urinary tract infection, acute respiratory failure, and obesity (Filing No. 11-7 at 15).  Later on June 26, 2012, Willis was evaluated for congestive heart failure and nonsustained ventricular tachycardia by John A. Ternay, M.D.  The results showed Willis's blood pressure was 158/99 with a few faint crackles at the right base of his lungs.  Willis's point of maximal impact was laterally displaced, an S3 was present, and he had a 1/6 midsystolic murmur at the left lower sternal border (Filing No. 11-7 at 10).  Dr. Ternay diagnosed hypertension, ventricular tachycardia, proteinuria +4, and acute systolic congestive heart failure, which likely was related to severe hypertension (Filing No. 11-7 at 11–12).

On June 28, 2012, an x-ray showed cardiomegaly without congestion.  On June 29, 2012, another x-ray demonstrated cardiac enlargement (Filing No. 11-7 at 18–19).  On July 2, 2012, upon discharge from North Knoxville Medical Center, Willis was diagnosed with severe malignant hypertension, nonischemic systolic congestive heart failure, nonsustained ventricular tachycardia, chronic kidney disease, and obstructive sleep apnea syndrome (Filing No. 11-8 at 15).

On July 3, 2012, Willis saw Dr. Heisel for a follow-up appointment after his hospital stay. Dr. Heisel noted that Willis was feeling much better than before their previous visit.  Willis was

4

wearing a life vest due to nonsustained ventricular tachycardia. Dr. Heisel noted the low ejection fraction from the earlier echocardiogram, recorded at 20–25%, and from the earlier nuclear stress test, recorded at 28%. Dr. Heisel diagnosed Willis with malignant hypertension, hypertensive cardiomyopathy, left ventricular hypertrophy, and obesity (Filing No. 11-10 at 55–57).

On July 9, 2012, Willis was seen by Dr. Kareti. He complained of hoarseness, swelling in the ankles, dyspnea (shortness of breath), irregular heartbeat, heartbeat skipping, coughing, snoring, stopping breathing during sleep, shortness of breath, urinating at night, and increased urinary frequency (Filing No. 11-7 at 49–50). Dr. Kareti noted S4 on auscultation, trace edema in the bilateral lower extremities, and cardiomyopathy. He also noted that Willis did not have a cardiac catheterization, most likely because of chronic kidney disease (Filing No. 11-7 at 51). On August 3, 2012, Willis returned to Dr. Heisel, and Willis's malignant hypertension, hypertensive cardiomyopathy, and impaired fasting glucose were noted (Filing No. 11-10 at 60–62).

On August 23, 2012, Willis saw Krishna C. Malineni, M.D. ("Dr. Malineni"), for an evaluation for a Biventricular Implantable Cardioverter Defibrillator ("BiV-ICD"). According to Dr. Malineni, Willis's experienced weight loss, photophobia, dyspnea on exertion, shortness of breath, flatus, urinary frequency, nocturia, dizziness and lightheadedness, and depression (Filing No. 11-11 at 32). Dr. Malineni's assessment noted severe dilated cardiomyopathy with class 3 chronic systolic congestive heart failure and a wide left bundle branch block with QRS greater than 130 milliseconds (Filing No. 11-11 at 33). Dr. Malineni noted that Willis was a candidate for BiV-ICD and recommended the procedure. *Id.*

On September 7, 2012, Willis underwent a BiV-ICD implantation to have a defibrillator implanted (Filing No. 11-10 at 71–72). On September 11, 2012, Dr. Heisel noted that the current treatment provided moderate improvement and that Willis was complying with the current

treatment.  Dr. Heisel also noted that Willis had hypertensive end organ damage that included kidney disease and heart failure (Filing No. 11-12 at 38).  On October 1, 2012, Willis underwent a sleep test.  Raymond J. Loffer, M.D., assessed mild to moderate dyssomnia secondary to sleep apnea/hypoapnea syndrome and periodic limb movements during sleep (Filing No. 11-14 at 16–17).

Dr. Heisel saw Willis on November 6, 2012.  Willis complained of moderate pain in his right shoulder that had persisted for about a week and was exacerbated by rotary movement. Dr. Heisel opined that the shoulder pain was from arthritis and noted a decreased range of motion (Filing No. 11-12 at 25–26).

On November 13, 2012, Willis returned to Dr. Kareti for a follow-up appointment.  It was noted that Willis experienced recent weight gain, significant abdominal distension, and shortness of breath (Filing No. 11-11 at 23).  On November 14, 2012, Willis's basic metabolic panel results were abnormal, and his glucose level was 342, which was above the normal range of 65–99 (Filing No. 11-13 at 46).  On November 19, 2012, Willis had another echocardiogram, which revealed low normal left ventricular systolic function, moderate left ventricular hypertrophy, mild left ventricular dilatation, and moderate left atrial dilatation (Filing No. 11-10 at 102).  This echocardiogram also indicated a left ventricular ejection fraction of 50%, which was up to the normal range.  *Id.*

On November 21, 2012, Willis had a follow-up visit for his heart failure with nurse practitioner Maria T. Galbo ("Nurse Galbo").  Nurse Galbo noted no abdominal distension, no palpitations, and no syncope.  She also noted an improvement with lower extremity edema (Filing No. 11-11 at 17).  She recorded his hypertensive cardiomyopathy, chronic heart failure, hypertension, hyperlipidemia, sleep apnea, and obesity.  *Id.*  Nurse Galbo also noted that Willis

reported being unable to walk one block or a flight of stairs without stopping because of shortness of breath on exertion.  *Id.*  Willis returned to Nurse Galbo on November 28, 2012, for another follow-up appointment.  She noted that Willis had no lower extremity edema but that he still had trouble with walking one block or one flight of stairs without getting winded (Filing No. 11-11 at 12–15).  Arising out of Willis's appointment with Nurse Galbo on December 5, 2012, chronic kidney disease was added to the current assessment (Filing No. 11-11 at 11).

On December 11, 2012, Willis returned to Dr. Heisel complaining of excessive thirst, increased urination, and blurred vision.  Dr. Heisel diagnosed type 2 diabetes and noted Willis's chronic kidney disease and malignant hypertension (Filing No. 11-13 at 19–20).

On December 12, 2012, Dr. Malineni completed a residual functional capacity assessment of Willis.  Dr. Malineni opined that Willis could lift ten pounds occasionally and frequently, could stand and walk for a total of two to four hours in an 8-hour workday but could stand for only an hour at a time before needing to change positions (Filing No. 11-7 at 64).  Dr. Malineni believed Willis could walk five hundred meters at one time and then need to rest.  He further opined that Willis could sit for a total of four to six hours in an 8-hour workday but could sit for only one to two hours at a time before needing to change positions (Filing No. 11-7 at 65).  Willis would need to periodically alternate between sitting and standing to relieve pain or discomfort and could only occasionally use his upper and lower extremities to push and pull (Filing No. 11-7 at 65).  Willis could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds, or balance, stoop, kneel, crouch, or crawl.  He could also only occasionally use the left and right extremities to reach in all directions (Filing No. 11-7 at 66).  Dr. Malineni believed that Willis would be absent from work on average one time per month due to his impairments and treatment, and that he would be unable to work an 8-hour day due to his limitations (Filing No. 11-7 at 67).

Willis had a follow-up appointment with Dr. Malineni on December 13, 2012, for his cardiomyopathy, chronic heart failure, kidney disease, diabetes, left bundle branch block, and sleep apnea (Filing No. 11-13 at 13).

On December 13, 2012, Dr. Kareti completed a medical questionnaire regarding Willis's chronic heart failure. Dr. Kareti reported that Willis's systolic heart failure resulted in an inability to perform an exercise tolerance test because of dyspnea, fatigue, palpitations, or chest discomfort (Filing No. 11-7 at 59–62). Dr. Kareti believed that Willis had marked restrictions of activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* He stated that the functional limitations were shown by Willis's significant weight gain, swelling, and shortness of breath that did not allow him to walk more than fifty to a hundred feet without getting fatigued. *Id.*

On December 18, 2012, Willis returned to Nurse Galbo for a follow-up visit for heart failure. Nurse Galbo again noted no palpitations and no syncope were experienced, and there was no lower extremity edema. Willis reported being unable to walk one block or a flight of stairs without stopping because of shortness of breath on exertion. He also reported to Nurse Galbo that he had no recent defibrillator shocks since his last visit with her. She recorded his hypertensive cardiomyopathy, chronic kidney disease, heart failure, hypertension, hyperlipidemia, sleep apnea, and obesity (Filing No. 11-11 at 3–7).

On January 7, 2013, Willis reported to Dr. Heisel that he was experiencing pain in his right shoulder and in his neck which started a few months earlier and felt severe at times. Willis's pain was exacerbated by certain shoulder movements, but his hand was not weak or numb. Upon examination, Willis had a decreased range of motion in his neck and shoulder and tenderness in

his right bicep.  Dr. Heisel referred Willis to receive physical therapy because of suspected right bicep tendinitis (Filing No. 11-13 at 3–4).

On January 10, 2013, Willis had his initial evaluation with physical therapist Brett McDonald ("Mr. McDonald").  Willis reported occasional issues with dizziness since his heart surgery to implant the defibrillator.  He reported pain and popping with any movement or pressure to his right arm.  Willis stated his shoulder could be achy while sitting, reaching back, lifting, and pushing up (Filing No. 11-17 at 57–58).  Mr. McDonald noted that Willis had decreased range of motion, decreased strength, decreased activity tolerance, decreased function, and pain. Mr. McDonald's prognosis for Willis was good, and he recommended some simple exercises to complete at home.  Throughout Willis's physical therapy sessions he complained of dizziness.  At his February 6, 2013 appointment, Willis continued to complain of a pop in his right shoulder at times.  Willis still felt soreness when lying down or reaching across his body. He did report that he felt improvement since starting physical therapy (Filing No. 11-17 at 31).  At Willis's February 15, 2013 physical therapy session, he still had decreased range of motion, decreased functional ability, increased pain, and poor posture (Filing No. 11-17 at 22–23).

On February 5, 2013, Willis met with Dr. Kareti for a follow-up appointment, and he complained of significant abdominal distension, dyspnea on exertion, and weight gain.  It was noted that he had complied with his diet and medications.  It also was noted that Willis did not have lower extremity edema.  Dr. Kareti increased one of the medications to help with the increased fluid balance, and he recommended that Willis return to the heart clinic sooner than originally scheduled (Filing No. 11-17 at 35–38).

On February 12, 2013, Willis had another follow-up appointment with Nurse Galbo for his congestive heart failure.  As she had reported from previous appointments, Nurse Galbo again

noted no palpitations, no syncope, and no lower extremity edema.  Willis again reported to Nurse Galbo that he had no recent defibrillator shocks since his last visit with her.  Nurse Galbo noted that Willis reported being unable to walk one block or a flight of stairs without stopping because of shortness of breath on exertion.  He also was experiencing abdominal bloating (Filing No. 11-19 at 18–23).  On February 25, 2013, Willis returned to Nurse Galbo for another appointment.  All things remained the same with the addition of Willis feeling better on diuretics (Filing No. 11-17 at 16–21).  Nurse Galbo also ordered another echocardiogram for reevaluation of Willis's ejection fraction.

On April 29, 2013, Nurse Galbo saw Willis and she noted that on March 15, 2013, Willis's ejection fraction was measured at 50% on the echocardiogram, which was an improvement from the measurement in mid-2012.  She also noted that Willis complained of nasal congestion, which was worse after he had cut the grass and gardened that day (Filing No. 11-19 at 45–49).

On May 7, 2013, Willis returned to Dr. Kareti for follow-up.  Dr. Kareti noted that Willis's weight had been stable since his last visit in February and that his blood pressure was improved at 120-130/80-90.  On examination, he had distant heart sounds, distended abdomen, and trace bilateral lower extremity edema (Filing No. 11-18 at 7).  Willis's physical examination results were unchanged, and Dr. Kareti noted that his cardiomyopathy and hypertension were "clinically stable."  *Id.*  Willis reported being able to do work in his yard without any significant shortness of breath or chest pain (Filing No. 11-18 at 4).

Willis returned to Nurse Galbo for a follow-up visit on June 3, 2013.  She noted similar complaints and findings from previous appointments.  She also noted that, on examination, Willis's abdomen was not distended, and he had no edema (Filing No. 11-19 at 62–67).

## II.   DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after he establishes that he is disabled.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled.  At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors.  20 C.F.R. § 416.920(a)(4)(i).  At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled.  20 C.F.R. § 416.920(a)(4)(ii).  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled.  20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps.  Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations."  *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th

Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p).  At step four, if the claimant is able to perform his past relevant work, he is not disabled.  20 C.F.R. § 416.920(a)(4)(iv).  At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v).  The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In reviewing the ALJ's decision, this court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ.  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).  While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome."  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."

*Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability.  *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III.   <u>THE ALJ'S DECISION</u>

The ALJ first determined that Willis met the insured status requirements of the Act through March 31, 2016.  The ALJ then began the five step disability analysis.  At step one, the ALJ found that Willis had not engaged in substantial gainful activity since June 26, 2012, the alleged onset date of disability.  At step two, the ALJ found that Willis had the following severe impairments: hypertension, cardiomegaly, congestive heart failure, left ventricular hypertrophy, left bundle branch block, chronic systolic heart failure with implantable cardiac device, obesity, tobacco abuse, mild to moderate dyssomnia secondary to sleep apnea/hypoapnea syndrome and periodic limb movements, and right shoulder dysfunction.  At step three, the ALJ concluded that Willis does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Willis has an RFC to perform sedentary work with certain postural and manipulative limitations.  The ALJ determined that Willis can occasionally lift and carry ten pounds and frequently lift and carry light articles weighing less than ten pounds. He can stand and walk two hours in an 8-hour workday and sit six to eight hours in an 8-hour workday. He has unlimited ability to push and pull up to ten pounds, and he has the capacity to carry out normal workday tasks, interact with supervisors and coworkers, interact with the general public, and identify and avoid hazards in the workplace (<u>Filing No. 11-2 at 16</u>).

At step four, the ALJ determined that Willis was unable to perform his past work as an over-the-road truck driver, engine assembler, plumber, electronics inspector, industrial cleaner, or machine molder because the demands of his past relevant work exceeded his RFC.  At step five, the ALJ determined that Willis is not disabled because there are jobs that exist in significant numbers in the national and state economy that Willis could perform, considering his age, education, past work experience, and RFC.  Therefore, the ALJ denied Willis's applications for DIB and SSI because he is not disabled.

## IV.   DISCUSSION

In his request for judicial review, Willis argues that the ALJ's step three analysis was not supported by substantial evidence and should be remanded for additional consideration. Additionally, he argues that the ALJ did not give proper weight to the opinions and records of his treating cardiologists.  For these reasons, Willis believes his case should be remanded and he should be found disabled.

### A.  The ALJ's Step Three Determination was Supported by Substantial Evidence

Willis asserts that the ALJ's decision to find him not disabled under step three of the disability determination was not supported by substantial evidence.  He asserts that the ALJ did not consider all the evidence of each of his impairments and his hypertension was not adequately addressed.  Although the ALJ did address his hypertension, Willis contends, the ALJ did not provide adequate justification to support the finding that his hypertension did not meet or medically equal a listed impairment in combination with the other impairments.

Willis asserts that he should be considered disabled because his hypertension had an adverse effect on other body systems in the form of end organ damage.  Willis believes that hypertension in aggregation with acute renal failure would be enough to establish a severe impairment that could meet or medically equal a listed impairment (Filing No. 16 at 23–24).  "The

ALJ is required to take into consideration all of the evidence in the record and discuss significant evidence contrary to his ruling." *McBride v. Massanari*, 169 F. Supp. 2d 857, 862 (N.D. Ill. 2001) (citing *Godbey v. Apfel*, 238 F.3d 803, 808–09 (7th Cir. 2000)). "The ALJ cannot claim to base his decision on substantial evidence if he has ignored substantial contrary evidence." *Id.* (citing *Stein v. Sullivan*, 892 F.2d 43, 47 (7th Cir. 1989)). According to Willis, the ALJ failed to take the contrary evidence into account when she ignored evidence of his end organ damage, specifically, Dr. Heisel's report that Willis had hypertensive end organ damage that included kidney disease and heart failure.

The Commissioner asserts that the ALJ fully examined the evidence in the record regarding Willis's hypertension and reasonably determined that the impairments did not meet or medically equal any listing impairments at step three. The Court agrees. The ALJ properly considered the effect of Willis's hypertension because there is no specific listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, for hypertension. The medical record that Willis points to in offering evidence of end organ damage also states that his hypertension was a chronic problem that was "gradually improving since onset" and that Willis's current treatment provided "moderate improvement." (Filing No. 11-12 at 51.)

In her decision, the ALJ addressed the hypertension and stated that "[a] careful review fails to provide any evidence of end organ damage on other body systems that would meet or medically equal [any listed impairments]." (Filing No. 11-2 at 16.) The ALJ did not determine that the hypertension did not affect the other systems of the body; rather, she determined that any effect that Willis's hypertension had on other body systems did not affect those systems to a level that would meet or medically equal a listed impairment. Additionally, the ALJ determined based on

the medical records that Willis's hypertension was stable in February 2013 (Filing No. 11-2 at 19). The Court must give deference to the ALJ's determination of fact and cannot reweigh the evidence.

Willis argues that the ALJ effectively ignored the evidence that is contrary to a disability determination and in effect "played doctor" (Filing No. 16 at 25).  The Seventh Circuit has stated that "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor."  *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). The Seventh Circuit also warned that the "cases in which we have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to address relevant evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).  Willis suggests that this is what happened here, because the ALJ failed to address the effect of his hypertension on his kidney disease and hypertensive cardiomyopathy.  Willis argues that there was no evidence at all supporting the ALJ's decision on this point.

In response, the Commissioner asserts that the medical opinions in the record do support the ALJ's decision, which include the medical opinions of the state agency reviewing physicians, Bruce Whitley, M.D., and Michael Brill, M.D.  "The Seventh Circuit has acknowledged that, in the absence of contrary medical opinions, the opinions of state agency reviewing physicians constitute substantial evidence on the issue of whether a claimant meets or medically equals any listing because state agency doctors are experts on determining medical equivalence." (Filing No. 17 at 5.)  The state agency reviewing physicians' medical opinions about medical equivalence supported the ALJ's decision on this point.  The Seventh Circuit also has held that disability determination and transmittal forms conclusively establish that "consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."  *Scheck*, 357 F.3d at 700.

16

The Court finds that the ALJ's decision regarding medical equivalence was supported by substantial evidence because two state agency reviewing physicians offered their medical opinions on equivalence based on their review of the medical record.  The ALJ did not "play doctor" because she did not fail to address relevant evidence.  The ALJ noted the possibility that hypertension could lead to end organ damage that in turn may meet or medically equal a listed impairment; however, she determined the other impairments did not meet or medically equal a listed impairment.  The ALJ relied on substantial evidence by her review of the medical records and the opinions of the two state agency reviewing physicians.

Willis argues further that the ALJ failed to consider any medical evidence or any expert opinion on whether his hypertension led to end organ damage that equaled a listed impairment. He asserts that the ALJ must consider a medical expert's opinion when determining whether a claimant's impairment equals a listing impairment because such a determination is a medical judgment not a legal judgment.  *See Barnett v. Barnhart*, 381 F.3d 664, 670–71 (7th Cir. 2004). Willis asserts that the ALJ erred when she did not obtain this medical testimony or expert's opinion to support her medical equivalence determination.

However, the ALJ had expert testimony from the two state agency reviewing physicians who are experts on determining medical equivalence.  The Commissioner points out that the Seventh Circuit has acknowledged the ALJ is not required to contact a second time a state agency consultant who has already rendered an opinion or to retain a new medical expert unless there is new evidence might cause the initial opinion to change.  *See* SSR 96-6p; *Buchanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010).  The Commissioner argues that Willis did not raise this argument to the ALJ and did not ask the ALJ to secure an additional opinion, and thus, the court should decide that where a claimant never presents an opinion on medical equivalence

himself nor asks the ALJ to contact the state agency consultants a second time, the appropriate inference is that the claimant decided that another expert opinion would not help her. *Buchanon ex rel. J.H.*, 368 F. App'x at 679. This Court is not persuaded by Willis's argument. The ALJ's decision was supported by sufficient evidence based on her review of the medical record and her reliance on the two opinions of the state agency reviewing physicians. The ALJ did not see a need to seek additional medical expert opinions because she had sufficient information available to her to determine medical equivalence.

Again, the court is not allowed to reweigh the evidence when reviewing the ALJ's disability determination. In this case, the ALJ's step three analysis and decision was supported by substantial evidence. The ALJ relied on and weighed the medical records provided by Willis's cardiologists, nurse practitioner, and primary care physician. She also relied on and weighed the expert opinions of the two state agency reviewing physicians. The ALJ did not "play doctor," and make a decision based on no medical evidence, or ignore the contrary evidence.

**B.  The ALJ Properly Weighed the Opinions of Willis's Treating Cardiologists**

Willis next argues that the ALJ failed to give proper weight to the opinions of his treating cardiologists Dr. Malineni and Dr. Kareti, who both opined that Willis is disabled. Willis points out that, at the administrative hearing, the vocational expert testified that if Willis was limited by the limitations that Dr. Malineni suggested, then he would not be able to perform his previous work and there would be no other jobs in the economy that he could perform.

An ALJ gives a treating physician's opinion "controlling weight" only if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). Willis argues that

his treating cardiologists' opinions should have been given the greatest weight or controlling weight. However, the Seventh Circuit has "disapproved any mechanical rule that the views of a treating physician prevail." *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001).

The ALJ gave the cardiologists' opinions regarding functional capacity limited weight because they were inconsistent with Willis's treatment notes and objective findings in the record as well as Willis's more recent improvements in his health and his activities of daily living. Dr. Kareti's opinion was that Willis could not perform a RFC test equivalent to 5 METs[3] or less due to dyspnea, fatigue, palpitation, or chest discomfort. He also opined that Willis could not walk more than fifty to a hundred feet without getting fatigued (Filing No. 11-7 at 59–62). Dr. Malineni opined that Willis could lift ten pounds occasionally and frequently, stand and walk for a total of two to four hours in an 8-hour workday, and sit for a total of four to six hours in an 8-hour workday (Filing No. 11-7 at 64–67). Dr. Malineni believed that Willis could walk five hundred meters at one time and then need to rest.

The ALJ noted, by November 2012, Willis's ejection fraction was at 50%, within normal range. By May 2013, Willis reported that he was able to perform outside activities and yard work without shortness of breath or chest pain, and his hypertension and cardiomyopathy were assessed as stable.

As a result, the ALJ gave limited weight to the RFC assessment of the cardiologists because they were inconsistent with the record as a whole. Their RFC assessments were not supported by objective measures and were inconsistent with Willis's improved health and activities of daily living.

---

[3] A MET is a measure of exercise intensity. It's formally known as a metabolic equivalent. METS are directly related to the intensity of physical activity and the amount of oxygen consumed. http://home.earthlink.net/ ~christophermorin /id33.html.

In addition to giving the cardiologists' RFC opinions limited weight, the ALJ gave limited weight to the opinions of the two state agency reviewing physicians regarding Willis's RFC. They opined that he could perform light work. The ALJ gave these opinions limited weight because they failed to consider the combined effect of Willis's impairments or his subjective complaints on his RFC (Filing No. 11-2 at 20). The ALJ considered and weighed the competing opinions regarding Willis's RFC and determined that he could perform sedentary work with additional limitations. The ALJ sufficiently explained the basis for her decision.

Again, the Court acknowledges that it cannot reweigh evidence in order to determine whether a more favorable outcome for Willis could have been provided. Here, the decisions of the ALJ were reasonable and justified with sufficient explanation and substantial evidence. It is within the authority of the ALJ to determine how much weight to give the evidence. It is not within the province of the treating cardiologists, reviewing physicians, or the vocational expert to make the final determination of Willis's RFC. This determination is reserved for the ALJ. Here, the ALJ provided reasonable explanations for weighing the evidence and making her determination, her disability determination was supported by substantial evidence, and there is no reason to reverse that decision. Willis's applications for benefits were properly denied.

## C.  CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**. Willis's appeal is **DISMISSED**.

**SO ORDERED.**

Date: 3/8/2016

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

20

DISTRIBUTION:

Michael G. Myers
mgmyers10@sbcglobal.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov